**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 2, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA;
OKLAHOMA STATE CHAMBER OF
COMMERCE AND ASSOCIATED
INDUSTRIES; METROPOLITAN TULSA
CHAMBER OF COMMERCE, INC.;
GREATER OKLAHOMA CITY
CHAMBER OF COMMERCE, INC.;
OKLAHOMA RESTAURANT
ASSOCIATION; OKLAHOMA HOTEL
AND LODGING ASSOCIATION,

      Plaintiffs-Appellees,

v.

W.A. DREW EDMONDSON, in his official
capacity as Attorney General for the state of
Oklahoma; KEITH McARTOR, STAN
EVANS, MARK ASHTON, ANN
CONG-TANG, ELVIA HERNANDEZ,
RITA MAXWELL, TERESA RENDON,
SAMMIE VASQUEZ, Sr., and JUANITA
WILLIAMS, in their official capacities as
members of the Oklahoma Human Rights
Commission,

      Defendants-Appellants,

and

THOMAS E. KEMP, Jr., JERRY
JOHNSON, and CONSTANCE IRBY, in
their official capacities as members of the

Nos. 08-6127 & 08-6128

Oklahoma Tax Commission,

    Defendants-Appellants.

-------------------------

AMERICAN CIVIL LIBERTIES UNION; NATIONAL IMMIGRATION LAW CENTER; CHANGE TO WIN; ARIZONA CHAMBER OF COMMERCE AND INDUSTRY; COLORADO ASSOCIATION OF COMMERCE AND INDUSTRY; ILLINOIS CHAMBER OF COMMERCE; INDIANA CHAMBER OF COMMERCE; KANSAS CHAMBER OF COMMERCE; KENTUCKY CHAMBER OF COMMERCE; MISSOURI CHAMBER OF COMMERCE AND INDUSTRY; NEW JERSEY CHAMBER OF COMMERCE; PENNSYLVANIA CHAMBER OF BUSINESS AND INDUSTRY; TENNESSEE CHAMBER OF COMMERCE AND INDUSTRY; TEXAS ASSOCIATION OF BUSINESS; ASSOCIATION OF WASHINGTON BUSINESS; WEST VIRGINIA CHAMBER OF COMMERCE; LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY AREA; ASIAN AMERICAN LEGAL DEFENSE EDUCATION FUND; ASIAN PACIFIC AMERICAN LEGAL CENTER; CENTRO LEGAL, INC.; IMMIGRATION EQUALITY; LA RAZA CENTRO LEGAL; LEGAL AID SOCIETY-EMPLOYMENT LAW CENTER; NATIONAL CENTER FOR LESBIAN RIGHTS; SOUTHERN POVERTY LAW CENTER; WOMEN'S EMPLOYMENT RIGHTS CLINIC; HUMAN RESOURCE INITIATIVE FOR A LEGAL WORKFORCE; ASSOCIATED BUILDERS AND CONTRACTORS, INC.,

    Amici Curiae.

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 08-CV-00109-C)**

M. Daniel Weitman, Assistant Attorney General (Kevin L. McClure, Assistant Attorney General, and Sandra D. Rinehart, Senior Attorney General, with him on the briefs), Oklahoma Attorney General's Office, Oklahoma City, Oklahoma, for Defendants-Appellants Edmondson and Human Rights Commissioners.

Guy L. Hurst, Assistant General Counsel, Oklahoma Tax Commission, Oklahoma City, Oklahoma, for Defendants-Appellants Tax Commissioners.

Carter G. Phillips (Eric A. Shumsky, Robert A. Parker, and Brian E. Nelson; and Robin S. Conrad and Shane Brennan, National Chamber Litigation Center, Inc., with him on the briefs), Sidley Austin LLP, Washington, D.C., for Plaintiffs-Appellees.

David A. Selden and Julie A. Pace, Ballard Spahr Andrews & Ingersoll, LLP, Phoenix, Arizona, and Burt M. Rublin, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, Pennsylvania, filed an Amici Curiae brief for The Human Resource Initiative For a Legal Workforce and Associated Builders and Contractors, Inc.

Patrick J. Szymanski, General Counsel, Change to Win, Washington, D.C., and John M. West, Bredhoff & Kaiser, P.L.L.C., Washington, D.C., filed an Amicus Curiae brief for Change to Win, in support of Appellees.

Lucas Guttentag and Jennifer Chang Newell, America Civil Liberties Union Foundation, Immigrants' Rights Project, San Francisco, California, Omar Jadwat, American Civil Liberties Union Foundation, Immigrants' Rights Project, New York, New York, Andrew Tauber, Mayer Brown LLP, Washington, D.C., and Linton Joaquin, Karen C. Tumlin, and Nora A. Preciado, National Immigration Law Center, Los Angeles, California, filed an Amici Curiae brief for American Civil Liberties Union and National Immigration Law Center, in support of Appellees.

Walter Dellinger, Sri Srinivasan, and Justin Florence, O'Melveny & Myers LLP, Washington, D.C., filed an Amici Curiae brief for The Arizona Chamber of Commerce and Industry, The Colorado Association of Commerce and Industry, The Illinois Chamber of Commerce, The Indiana Chamber of Commerce, The

Kansas Chamber of Commerce, The Kentucky Chamber of Commerce, The Missouri Chamber of Commerce and Industry, The New Jersey Chamber of Commerce, The Pennsylvania Chamber of Business and Industry, The Tennessee Chamber of Commerce and Industry, The Texas Association of Business, The Association of Washington Business, and the West Virginia Chamber of Commerce, in support of Appellees.

Kevin M. Fong and Brian J. Wong, Pillsbury Winthrop Shaw Pittman LLP, and Robert Rubin and Nira Geevargis, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, San Francisco, California, filed an Amici Curiae brief for Lawyers' Committee for Civil Rights of the San Francisco Bay Area, et al., in support of Appellees.

---

Before **KELLY**, **LUCERO**, and **HARTZ**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

The Oklahoma Taxpayer and Citizen Protection Act of 2007 (the "Act" or the "Oklahoma Act") is one of a multitude of recent state enactments that regulate illegal immigration and verification of employment eligibility. This case implicates three provisions of the Act. Section 7(B) forces businesses to utilize the Basic Pilot Program to verify the work authorization status of their employees on pain of debarment from contracting with Oklahoma public employers. Section 7(C) makes it a discriminatory practice for an employer to terminate an authorized worker while retaining an employee that the employer knows or reasonably should know is unauthorized to work. Section 9 requires contracting entities either to verify the work eligibility of their individual independent contractors or withhold certain taxes from those contractors. Otherwise, the

-4-

contracting entity is liable to the State for the money not withheld.

Plaintiffs, various chambers of commerce and trade associations ("plaintiffs" or the "Chambers"), challenged Sections 7(B), 7(C), and 9 of the Act. They claimed that all three sections were expressly and impliedly preempted by federal law and moved for a preliminary injunction to bar Oklahoma's Governor, Attorney General, Human Rights Commission, and Tax Commission (collectively "defendants" or "Oklahoma") from enforcing the challenged provisions. Defendants opposed a preliminary injunction and moved to dismiss. Oklahoma argued that the Chambers lacked standing, that certain defendants were immune from suit under the Eleventh Amendment, and that the Tax Injunction Act, 28 U.S.C. § 1341, deprived the district court of jurisdiction to enjoin Section 9. The district court denied the motions to dismiss and granted the preliminary injunction. All defendants, save the Governor, appeal.

Faced with the same issues that were before the district court, we conclude: (1) the Chambers have standing; (2) that the Eleventh Amendment precludes the case only insofar as the Attorney General is named as a defendant in the challenge to Sections 7(C) and 9; and (3) the district court properly exercised jurisdiction over the Chambers' challenge to Section 9. We further hold that the Chambers are likely to succeed on the merits of their claims that Section 7(C) is expressly preempted and that Section 9 is impliedly preempted. Moreover, the remaining considerations favor issuance of a preliminary injunction.

Although their reasoning differs, my colleagues conclude the district court erred in its determination that Section 7(B) is preempted, and thus the panel reverses the district court's grant of a preliminary injunction against the enforcement of Section 7(B). I dissent from the judgment of the court on this issue and would hold that Section 7(B) is impliedly preempted and that the issuance of a preliminary injunction was appropriate. Accordingly, this opinion is that of the court except with respect to sections V.B.2 and V.B.4.

We have jurisdiction under the collateral order doctrine to consider the district court's denial of Eleventh Amendment immunity, P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 147 (1993), and under 28 U.S.C. § 1292(a)(1) to review the grant of a preliminary injunction. The panel dismisses in part, reverses in part, and affirms in part.

## I

This case requires us to consider the interplay between the federal employment verification regime and that of the Oklahoma Act. We begin by outlining these potentially-conflicting systems.

## A

Enacted in 1986, the Immigration Reform and Control Act ("IRCA") created "a comprehensive scheme prohibiting the employment of illegal aliens in the United States." Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 147 (2002). Section 101(a)(1) of IRCA makes it "unlawful for a person or other

entity . . . to hire . . . for employment in the United States an alien knowing the alien is an unauthorized alien." 8 U.S.C. § 1324a(a)(1), (a)(1)(A). An "unauthorized alien" is defined as an "alien [who] is not at that time either (A) . . . lawfully admitted for permanent residence, or (B) authorized to be so employed by [IRCA] or by the Attorney General." § 1324a(h)(3).

Federal law exhaustively details a specialized administrative scheme for determining whether an employer has knowingly employed an unauthorized alien.[1] § 1324a(e). An employer that does so is subject to a range of civil and criminal penalties, including fines, § 1324a(e)(4), cease and desist orders, id., and imprisonment, § 1324a(f)(1). Consistent with its comprehensive nature, IRCA includes an express preemption provision: "The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." § 1324a(h)(2).

IRCA also establishes an "extensive 'employment verification system,' designed to deny employment to aliens who (a) are not lawfully present in the United States, or (b) are not lawfully authorized to work in the United States." Hoffman Plastic, 535 U.S. at 147 (citations omitted). Known as the I-9 system,

---

[1] Although the parties use varying terminology, because both federal law and the Oklahoma Act use the term "unauthorized alien," 8 U.S.C. § 1324a(a)(1); Okla. Stat. tit. 25, § 1312(4), we employ that phrase.

employers are required to verify the identity of their employees and ensure they are eligible to work in the United States by examining certain specified documents. 8 C.F.R. § 274a.2(b). IRCA establishes a list of permissible verification documents, enabling employees to prove eligibility by supplying any document on the list. 8 U.S.C. § 1324a(b)(1)(A)-(b)(1)(D). An employee who submits verification documents that "reasonably appear[] on [their] face to be genuine" may not be required to produce different or additional documents if such requests by employers are made for the purpose or with the intent of discriminating. §§ 1324a(b)(1)(A)(ii), 1324b(a)(6). Federal law further defines the class of individuals who must verify employment eligibility, requiring verification for employees but not for independent contractors. See § 1324a(a)(1)(A); 8 C.F.R. § 274a.1(f) (excluding "independent contractor" from the definition of "employee"); § 274a.1(g) (employers not responsible for verifying work authorization of independent contractors).

Congress opted to create a substantial safe harbor for employers that comply with the I-9 system. 8 U.S.C. § 1324a(b)(6)(A). Unless an employer persists in violating IRCA after being put on notice of its noncompliance or engages in a pattern or practice of violations, § 1324a(b)(6)(B), (C), employers who attempt to comply in good faith are protected from civil and criminal penalties under federal law, § 1324a(b)(6)(A).

The I-9 system was the exclusive employment verification procedure under

-8-

federal law until passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").  Chicanos Por La Causa, Inc. v. Napolitano, 558 F.3d 856, 861 (9th Cir. 2009).  In enacting IIRIRA, Congress "directed the Attorney General to establish three pilot programs to ensure efficient and accurate verification of any new employee's eligibility for employment."  Id.; see IIRIRA, Pub. L. No. 104-208, div. C, § 401(a), 110 Stat. 3009-546, 3009-655 (1996).[2]  Of those three, only the Basic Pilot Program remains.[3]

Unlike the I-9 paper verification process, Basic Pilot is an internet-based system of employment authorization verification.  Chicanos Por La Causa, 558 F.3d at 862.  An employer seeking to participate in Basic Pilot must enter a Memorandum of Understanding with the federal government.  E-Verify Memorandum of Understanding, available at http://www.uscis.gov/files/nativedocuments/MOU.pdf.  Under the program, an employer submits employee information electronically to the federal government, which then checks the

---

[2] Sections 401 to 405 of IIRIRA, which govern the pilot programs, are not codified in the body of the U.S. Code but appear in a note appended to 8 U.S.C. § 1324a.

[3] Basic Pilot is also commonly referred to as E-Verify.  Congress recently extended Basic Pilot through September 30, 2012.  Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, title v, § 547, 123 Stat. 2142, 2177.  Although the statute initially gave the Attorney General responsibility for Basic Pilot, the Department of Homeland Security now administers it.  See Basic Pilot Program Extension and Expansion Act of 2003, Pub. L. No. 108-156, §§ 3-4, 117 Stat. 1944, 1944-45.

information against a database containing citizenship and work authorization information.  If the information submitted by the employer matches the Social Security database and the employee is a U.S. citizen, the employer is immediately notified that the employee is eligible to work in the United States.  For non-citizens, the submitted information is checked against U.S. Citizenship and Immigration Services ("USCIS") records.

By contrast, when employee information is inconsistent with either the Social Security or USCIS databases, the employer receives a tentative nonconfirmation.  "A tentative nonconfirmation . . . does not mean that the employee is not authorized to work, and employers may not interpret it as such." Pilot Programs for Employment Eligibility Confirmation, 62 Fed. Reg 48,309, 48,312 (Sep. 15, 1997) [hereinafter Pilot Programs].  Rather, because federal records may be inaccurate, the employee is notified of the tentative nonconfirmation and has eight federal workdays to contest the result.[4]  Id.  While the challenge is being resolved, the employer may not take adverse action against the employee.  Id. at 48,310.  An employee who does not contest the tentative nonconfirmation or is otherwise found ineligible to work must be terminated from employment lest the employer be presumed to have employed an unauthorized alien.  Id. at 48,313.

---

[4] An executive branch report to Congress in the record indicates that employees have ten federal workdays to contest a tentative nonconfirmation.

Basic Pilot is a voluntary alternative to the I-9 system for most employers. Expansion of the Basic Pilot Program to All 50 States and the District of Columbia; Providing Web-Based Access, 69 Fed. Reg. 75,997, 75,998 (Dec. 20, 2004).  IIRIRA explains that "any person or other entity that conducts any hiring . . . may elect to participate in that pilot program.  Except as specifically provided in subsection (e), the Attorney General may not require any person or other entity to participate in a pilot program."  IIRIRA § 402(a)[5]; see also § 402(d)(2) ("The Attorney General shall widely publicize the election process and pilot programs, including the voluntary nature of the pilot programs . . . .").

The record indicates that Basic Pilot is far from perfect.  A 2007 report to the Department of Homeland Security ("DHS") found that "the database used for verification is still not sufficiently up to date to meet the IIRIRA requirement for accurate verification."  Westat, Findings of the Web Basic Pilot Evaluation xxi (2007).  That report documented an error rate of approximately 10% for naturalized citizens, and calculated that foreign-born individuals who are eligible to work in the United States were 30 times as likely to receive an erroneous tentative nonconfirmation as U.S.-born employees.  Id. at xxv.  It concluded further that "improvements are needed, especially if the Web Basic Pilot becomes

_____

[5] Subsection 402(e) lists particular federal government entities required to utilize Basic Pilot, and authorizes the Secretary of Homeland Security to order certain violators of the Immigration and Nationality Act to use the program. § 402(e).

-11-

a mandated national program," id. at xxi, but that correcting the problems "will take considerable time and will require better data collection and data sharing between [Social Security], USCIS, and the U.S. Department of State than is currently the case," id. at xxvi.

Through several extensions of Basic Pilot, Congress has opted to retain the program's voluntary character. E.g., Omnibus Appropriations Act of 2009, div. J, § 101; Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, Pub. L. No. 110-329, § 143, 122 Stat. 3574, 3580 (2008); Basic Pilot Extension Act of 2001, Pub. L. No. 107-128, § 2, 115 Stat. 2407, 2407 (2002).

**B**

With this federal law in mind, we turn to the Oklahoma Taxpayer and Citizen Protection Act of 2007. The Act reflects Oklahoma's judgment that "illegal immigration is causing economic hardship and lawlessness in this state." Oklahoma Taxpayer and Citizen Protection Act of 2007, 2007 Okla. Sess. Law. Serv., Ch. 112, § 2 (West). The Act states that unauthorized aliens have been "harbored and sheltered" in Oklahoma and issued "identification cards . . . without verifying immigration status." Id. These actions "impede and obstruct the enforcement of federal immigration law, undermine the security of our borders, and impermissibly restrict the privileges and immunities of the citizens of Oklahoma." Id. "Discourag[ing] illegal immigration" and preventing employment of illegal aliens are avowed purposes of the three provisions at issue

in this case.  Id.

Section 7(B) of the Act, Okla. Stat. tit. 25, § 1313(B)(2), provides that no contractor or subcontractor may contract or subcontract with a public employer unless it utilizes the Status Verification System ("SVS")[6] to verify work eligibility for all new employees.  Because it is undisputed that three of the four methods of participating in the SVS either do not exist, § 1312(1)(b), (c), or would require misuse of a federal program, § 1312(1)(d), the Act effectively mandates Basic Pilot, § 1312(1)(a).  Thus, under Section 7(B), a contractor or

---

[6] Section 6 of the Act defines Status Verification System as:

a.      the electronic verification of work authorization program of the Illegal Immigration Reform and Immigration Responsibility Act of 1996, P.L. 104-208, Division C, Section 403(a); 8 U.S.C., Section 1324a, and operated by the United States Department of Homeland Security, known as the Basic Pilot Program,

b.      any equivalent federal program designated by the United States Department of Homeland Security or any other federal agency authorized to verify the work eligibility status of newly hired employees, pursuant to the Immigration Reform and Control Act of 1986 (IRCA), D.L. 99-603,

c.      any other independent, third-party system with an equal or higher degree of reliability as the programs, systems, or processes described in this paragraph, or

d.      the Social Security Number Verification Service, or such similar online verification process implemented by the United States Social Security Administration[.]

§ 1312(1)(a)-(d).

-13-

subcontractor who verifies through the I-9 system cannot obtain certain state contracts.[7]

Section 7(C) of the Act makes it a "discriminatory practice" for any employer to "discharge an employee working in Oklahoma who is a United States citizen or permanent resident alien while retaining an employee who the employing entity knows, or reasonably should have known, is an unauthorized alien." § 1313(C)(1).[8] An employer who engages in such a discriminatory

[7] In full, Section 7(B) provides:

1.      After July 1, 2008, no public employer shall enter into a contract for the physical performance of services within this state unless the contractor registers and participates in the Status Verification System to verify the work eligibility status of all new employees.

2.      After July 1, 2008, no contractor or subcontractor who enters into a contract with a public employer shall enter into such a contract or subcontract in connection with the physical performance of services within this state unless the contractor or subcontractor registers and participates in the Status Verification System to verify information of all new employees.

3.      The provisions of this subsection shall not apply to any contracts entered into prior to the effective date of this section even though such contracts may involve the physical performance of services within this state after July 1, 2008.

§ 1313(B) (footnote omitted).

[8] In full, Section 7(C) states:

1.      It shall be a discriminatory practice for an employing entity to discharge an employee working in Oklahoma who is a United States citizen or permanent resident alien while retaining an employee who the employing

(continued...)

-14-

practice is subject to investigation by the Oklahoma Human Rights Commission

("HRC"), § 1502; temporary injunctive relief issued by an Oklahoma court at the

request of the HRC, § 1502.1; cease-and-desist orders, § 1505(B); and affirmative

relief, including reinstatement, back pay, costs and attorneys' fees, § 1505(C).

An employer that uses Basic Pilot, however, is "exempt from liability,

investigation, or suit" under Section 7(C)'s safe harbor.  § 1313(C)(2).

Section 9 of the Act, unlike federal verification law, requires all businesses

to obtain "documentation to verify . . . independent contractor[s'] employment

authorization."  Okla. Stat. tit. 68, § 2385.32.[9]  If an independent contractor does

---

[8](...continued)
entity knows, or reasonably should have known, is an unauthorized alien hired after July 1, 2008, and who is working in Oklahoma in a job category that requires equal skill, effort, and responsibility, and which is performed under similar working conditions, as defined by 29 U.S.C., Section 206(d)(1), as the job category held by the discharged employee.

2. An employing entity which, on the date of the discharge in question, was currently enrolled in and used a Status Verification System to verify the employment eligibility of its employees in Oklahoma hired after July 1, 2008, shall be exempt from liability, investigation, or suit arising from any action under this section.

3. No cause of action for a violation of this subsection shall arise anywhere in Oklahoma law but from the provisions of this subsection.

§ 1313(C).

[9] In its entirety, Section 9 provides:

A.    If an individual independent contractor, contracting for the physical performance of services in this state, fails to provide to the

(continued...)

not provide proof that she is eligible to work, the contracting entity must withhold

compensation in an amount equal to "the top marginal income tax rate" allowed

under Oklahoma law.  § 2385.32(A).  This is an exception to the general rule in

Oklahoma, under which contracting entities are not required to withhold taxes

from independent contractors.  § 1701.1(A), (C).  Contracting entities that fail to

comply with this withholding requirement are liable to the state for any

withholding shortfall.  § 2385.32(B).

---

[9](...continued)
> contracting entity documentation to verify the independent contractor's employment authorization, pursuant to the prohibition against the use of unauthorized alien labor through contract set forth in 8 U.S.C., Section 1324a(a)(4), the contracting entity shall be required to withhold state income tax at the top marginal income tax rate as provided in Section 2355 of Title 68 of the Oklahoma Statutes as applied to compensation paid to such individual for the performance of such services within this state which exceeds the minimum amount of compensation the contracting entity is required to report as income on United States Internal Revenue Service Form 1099.

B.     Any contracting entity who fails to comply with the withholding requirements of this subsection shall be liable for the taxes required to have been withheld unless such contracting entity is exempt from federal withholding with respect to such individual pursuant to a properly filed Internal Revenue Service Form 8233 or its equivalent.

C.     Nothing in this section is intended to create, or should be construed as creating, an employer-employee relationship between a contracting entity and an individual independent contractor.

§ 2385.32.

# C

Plaintiffs are various national, state, and local chambers of commerce and trade associations that represent businesses in Oklahoma. The Chambers filed a complaint in U.S. District Court for the Western District of Oklahoma alleging that Sections 7(B), 7(C), and 9 of the Oklahoma Act were expressly and impliedly preempted by federal law and thus unconstitutional under the Supremacy Clause. See U.S. Const. art. VI, cl. 2; 8 U.S.C. § 1324a(h)(2). They sought both declaratory and injunctive relief from defendants, Oklahoma Governor Brad Henry, Oklahoma Attorney General W.A. Drew Edmondson, the members of the Oklahoma HRC, and the members of the Oklahoma Tax Commission, all sued in their official capacities.[10]

The Chambers immediately moved for a preliminary injunction, and defendants moved to dismiss.[11] Denying all motions to dismiss, the district court issued a preliminary injunction prohibiting enforcement of the Act. It rejected defendants' standing, sovereign immunity, and Tax Injunction Act arguments. With respect to the merits, the court concluded that the Chambers were substantially likely to succeed on their express preemption claim as to all three

[10] We use "HRC" and "Tax Commission" as shorthand, recognizing that the lawsuit is against the members of those commissions in their official capacities.

[11] As outlined in the complaint, the Chambers requested that the Governor and Attorney General be enjoined from enforcing Sections 7(B), 7(C), and 9; that the HRC be enjoined from enforcing Section 7(C); and that the Tax Commission be enjoined from enforcing Section 9.

challenged sections of the Act because those sections imposed civil sanctions in contravention of 8 U.S.C. § 1324a(h)(2).[12] The court further determined that the remaining preliminary injunction factors were satisfied. All defendants, except Governor Henry, filed this timely interlocutory appeal.

## II

We begin, as we must, by considering jurisdictional issues, turning first to the Chambers' standing to challenge Sections 7(B), 7(C), and 9 of the Oklahoma Act.[13] Article III of the Constitution limits the jurisdiction of federal courts to actual cases or controversies. Summers v. Earth Island Inst., 129 S. Ct. 1142, 1148 (2009); Dias v. City and County of Denver, 567 F.3d 1169, 1176 (10th Cir. 2009). To establish standing, plaintiffs bear the burden of demonstrating that they have suffered an injury-in-fact which is concrete and particularized as well as actual or imminent; that the injury was caused by the challenged sections; and

---

[12] Because it concluded that Sections 7(B), 7(C), and 9 were likely expressly preempted, the district court did not consider the Chambers' alternative arguments that these sections were either field or conflict preempted.

[13] In addition to questioning this court's jurisdiction, the Tax Commission argues that the Chambers "bring their suit as a civil rights suit under 42 U.S.C. § 1983," which we are told does not permit a preemption claim. Although the Chambers did invoke § 1983 in their complaint, they also expressly and repeatedly indicated that their claims arose under the Supremacy Clause. We have held that "[a] party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action." Qwest Corp. v. City of Santa Fe, 380 F.3d 1258, 1266 (10th Cir. 2004). Because the Chambers have a valid right of action under the Supremacy Clause, we need not address the Tax Commission's § 1983 argument.

-18-

that the requested relief would likely redress their alleged injuries. Summers, 129 S. Ct. at 1149; Dias, 567 F.3d at 1176. Because the Chambers claim a future injury and seek relief in the form of a prospective injunction, they must show that the "threatened injury is real, immediate, and direct." Davis v. FEC, 128 S. Ct. 2759, 2769 (2008) (citation omitted); see also Dias, 567 F.3d at 1176-77. We review questions of standing de novo. Stewart v. Kempthorne, 554 F.3d 1245, 1254 (10th Cir. 2009).

In the case at bar, plaintiffs allege associational standing to raise claims of their members. See Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 342 (1977). An association has such standing only if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id. at 343. Defendants challenge only the first prong of the Chambers' associational standing, and the record reveals the latter two prongs have been met.

**A**

As to the Section 7(B) claim, Oklahoma contends that the Chambers' members lack an injury-in-fact and that they have not demonstrated redressability. We disagree on both counts.

Both compliance and non-compliance with Section 7(B) injure the

-19-

Chambers' members. As noted above, Section 7(B) effectively forces employers to use Basic Pilot. See Part I.B., supra. Adopting Basic Pilot imposes significant economic injuries in the form of implementation and training expenses, which the Chambers allege may total well more than a thousand dollars per business per year. By the same token, the Chambers' membership would also be harmed by non-compliance. Their membership includes companies that currently have contracts with public employers in Oklahoma and hope to enter into such contracts in the future but will be ineligible under the terms of Section 7(B) unless they adopt Basic Pilot. Debarment from public contracts and the attendant economic losses are themselves harmful to the Chambers' members.[14] These are "real, immediate, and direct" threats of injury. See Davis, 128 S. Ct. at 2769.

Redressability presents a more difficult question. Although plaintiffs seek an injunction against the Attorney General,[15] Oklahoma responds that the "Attorney General has no power to enforce Section 7(B)." (Attorney General's Supp. Br. 2); see also Bronson v. Swensen, 500 F.3d 1099, 1111 (10th Cir. 2007)

---

[14] We find no merit to Oklahoma's argument that the Chambers lack standing because they are not required to do business with the State. Even if businesses are not required to contract with the State, Oklahoma may not impose unconstitutional limitations on businesses that choose to do so.

[15] Oklahoma's governor was also preliminarily enjoined from enforcing Section 7(B), but he has not appealed. Thus, we need not consider whether the injunction would redress the Chambers' injury as to the Governor. No matter the result of this interlocutory appeal, the injunction will operate against the Governor pending further proceedings in the district court.

("The redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute.").

In deciding this issue, we are mindful that the Chambers need not show "that a favorable decision will relieve [their] every injury." Larson v. Valente, 456 U.S. 228, 243 n.15 (1982). Rather, they need only show "an injury . . . that is likely to be redressed by a favorable decision." Id. (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 38 (1976)). In Larson, for example, the Court concluded that the plaintiff could challenge the constitutionality of a state statute applicable to religious organizations even though it was unclear whether the plaintiff qualified as a religious organization. Id. at 241-44. Whether an injunction would benefit the plaintiff was unclear, yet the Court concluded that the plaintiff's injury was likely redressable. Id. at 242-43. Similarly, in Massachusetts v. EPA, 549 U.S. 497 (2007), the Court held that Massachusetts had standing to contest EPA's refusal to regulate greenhouse gas emissions from new motor vehicles. Id. at 526. Although a continued rise in sea levels on the shores of Massachusetts was contingent upon a number of variables beyond the control of EPA, the state's injury was nonetheless deemed redressable because the risk of harm "would be reduced to some extent if petitioners received the relief they seek." Id. at 526 (emphasis added); see also id. at 525 ("While it may be true that regulating motor-vehicle emissions will not by itself reverse global warming, it by no means follows that we lack jurisdiction to decide whether EPA

-21-

has a duty to take steps to <u>slow</u> or <u>reduce</u> it." (citing <u>Larson</u>, 456 U.S. at 244 n.15)).

We conclude that the harms alleged by the Chambers will likely be "reduced to some extent" by an injunction running against the Attorney General.[16] <u>See</u> <u>id.</u> at 526; <u>Larson</u>, 456 U.S. at 244 n.15. As the Attorney General concedes, he drafts contracts for state officials upon request. <u>See</u> Okla. Stat. tit. 74, § 18b(A)(7). An injunction would prevent him from inserting into such contracts a provision requiring use of Basic Pilot, or from refusing to prepare a contract because it violates the terms of Section 7(B). Further, pursuant to his authority to "initiate or appear in any action in which the interests of the state or the people of the state are at issue," § 18b(A)(3), the Attorney General brings civil actions against businesses that violate state law and defends state agencies sued by their contractors, <u>see, e.g.</u>, <u>Colclazier v. State ex rel. Okla. Indigent Defense Sys. Bd.</u>, 951 P.2d 622, 624 (Okla. 1997) (Attorney General representing state agency in a suit seeking to compel agency to award a contract); <u>State ex rel. Edmondson v. Cemetery Co.</u>, 122 P.3d 480, 481-82 (Okla. Civ. App. 2005) (Attorney General

---

[16] That some public employers outside the scope of the injunction might refuse to enter into contracts with businesses employing only I-9 verification does not divest plaintiffs of standing. An opposite holding would contravene Supreme Court precedent so as to require complete redressability. In any event, "we may assume it is substantially likely that [other] officials would abide by an authoritative interpretation of the . . . provision . . . even though they would not be directly bound by such a determination." <u>Utah v. Evans</u>, 536 U.S. 452, 460 (2002) (quotation omitted).

-22-

seeking declaration that state statutes applied to particular company). An injunction would prevent him from filing lawsuits or defending against suits on the basis of Section 7(B). These statutory duties are more than sufficient to establish redressability at this stage of the case. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (explaining that the burden to demonstrate standing varies at different stages of litigation). "[A] favorable decision will relieve a discrete injury to" the Chambers. Larson, 456 U.S. at 243 n.15; see also Massachusetts, 549 U.S. at 526. Accordingly, the Chambers have sufficiently demonstrated standing to seek a preliminary injunction as to Section 7(B).

**B**

We reach the same conclusion regarding the Chambers' Section 7(C) claim. That section prohibits employers from firing an authorized worker while retaining an employee the employer knows or reasonably should know is unauthorized, Okla. Stat. tit. 25, § 1313(C)(1), but exempts employers from liability if they use Basic Pilot, § 1313(C)(2). Oklahoma argues that the Chambers lack standing to contest Section 7(C) because they have not sufficiently alleged injury-in-fact. Again, we do not agree.

To obtain the benefit of the Section 7(C) safe harbor, an employer must use Basic Pilot. As we explained, see Part II.A, supra, Basic Pilot imposes substantial costs that constitute injury-in-fact. Alternatively, an employer who opts not to take advantage of the state safe harbor and instead embraces the

-23-

federal safe harbor for I-9 users also suffers a cognizable injury. Such an employer is potentially exposed to Section 7(C) penalties including financial levies and injunctive action whenever it terminates an authorized employee. For instance, Section 7(C) exposure would be substantial for highway construction companies whose workforce fluctuates greatly throughout the year with every termination potentially leading to a lawsuit. (Webb Decl. 4, ¶ 18). It is hardly controversial that exposure to liability constitutes injury-in-fact. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128-29 (2007); Protocols, LLC v. Leavitt, 549 F.3d 1294, 1299-1301 (10th Cir. 2008).

Oklahoma responds that in order to have standing to contest Section 7(C), an employer "would have to 'knowingly' hire illegal workers and then terminate the employment of a legal Oklahoma worker."[17] (Attorney General's Br. 32). Both the Supreme Court and this court have steadfastly rejected such an onerous requirement. "[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced." MedImmune, Inc., 549 U.S. at 128-29 (emphasis omitted). The Chambers' complaint and declarations demonstrate injury-in-fact to their

---

[17] Oklahoma misstates the scienter requirement of Section 7(C). Employers are liable if they "know[], or reasonably should have known," that they retained an unauthorized alien while terminating an authorized worker. Okla. Stat. tit. 25, § 1313(C)(1) (emphasis added).

-24-

members, leading us to conclude they have standing to obtain a preliminary injunction as to Section 7(C).

## C

Lastly, we dispose of Oklahoma's argument that the Chambers lack standing to challenge Section 9 because they have failed to allege injury-in-fact. To comply with that section, a contracting entity must either verify the work eligibility of its individual independent contractors[18] or withhold from the independent contractors an amount equal to the top marginal income tax rate. Okla. Stat. tit. 68, § 2385.32(A). Because federal verification requirements are limited to employees (and do not extend to independent contractors), see 8 U.S.C. § 1324a(a)(1)(A); 8 C.F.R. § 274a.1(f), (g), businesses that opt for the verification approach are potentially exposed to liability under federal law for having engaged in "an unfair immigration-related employment practice," see 8 U.S.C. § 1324b(a)(6), (b). To avoid that possibility, the Chambers have alleged that their members will either withhold money from individual independent contractors pursuant to Section 9(A) of the Oklahoma Act or incur penalties under Section 9(B). Okla. Stat. tit. 68, § 2385.32(A), (B). If a contracting entity chooses the former course, it must offset the withholding requirement by paying

---

[18] Specifically, the statutory language requires the employer to receive "documentation to verify the independent contractor's employment authorization." Okla. Stat. tit. 68, § 2385.32(A). For the sake of brevity, we refer to this obligation as verification.

-25-

more money to its independent contractors. If it chooses the latter, it must pay a substantial fine. Either alternative results in an economic injury-in-fact.[19]

### III

Having concluded that the Chambers possess standing to mount their challenge, we turn to the second alleged jurisdictional defect. According to the defendants, the Attorney General is immune from suit under the Eleventh Amendment as to all three challenged sections of the Oklahoma Act.[20] The Chambers advance counter-arguments to the Attorney General's claim of immunity only as to Sections 7(B) and 7(C), but not as to Section 9. Plaintiffs have therefore waived any response to the contention that the Attorney General is immune from suit with respect to Section 9.

We review de novo the denial of a motion to dismiss based on Eleventh Amendment immunity. Chaffin v. Kansas State Fair Bd., 348 F.3d 850, 865 (10th Cir. 2003). Under the Eleventh Amendment, states are generally immune from suits brought in federal court by their own citizens, by citizens of other states, by foreign sovereigns, and by Indian tribes. See U.S. Const. amend. XI; Prairie

---

[19] Oklahoma also asserts that the Chambers lack standing to challenge Section 9 as against either the Attorney General or the HRC, but we read the complaint as naming only the Governor and Tax Commission as defendants in the challenge to Section 9. See supra note 11.

[20] HRC has conceded that its members are not immune with respect to Section 7(C), (Attorney General's Br. 14, 20), as has the Tax Commission with respect to Section 9, (Tax Commission's Br. 4). See supra note 11.

Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 827 (10th Cir. 2007).

However, the Eleventh Amendment does not apply to suits against a state officer in his official capacity seeking only prospective relief. Edelman v. Jordan, 415 U.S. 651, 667-68 (1974); Ex parte Young, 209 U.S. 123, 159-60 (1908). This exception applies so long as the defendant officer has "some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." Ex parte Young, 209 U.S. at 157. An officer need not have a "special connection" to the allegedly unconstitutional statute; rather, he need only "have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty." Wagnon, 476 F.3d at 828 (citing Ex parte Young, 209 U.S. at 157); see also Finstuen v. Crutcher, 496 F.3d 1139, 1151 (10th Cir. 2007) ("So long as there is [some] connection [with enforcement of the act], it is not necessary that the officer's enforcement duties be noted in the act." (quotation omitted)). Because the defendants are sued in their official capacities and the Chambers seek only prospective relief, Oklahoma disputes solely the connection between the Attorney General and enforcement of the challenged sections.

For the same reasons we concluded that the claimed Section 7(B) injury is redressable, Part II.A, supra, we conclude that the Attorney General has a particular duty to enforce that section, see Okla. Stat. tit. 74, § 18b(A)(3), (7), and a demonstrated willingness to exercise that duty, see, e.g., Colclazier, 951 P.2d at

-27-

624; Cemetery Co., 122 P.3d at 481-82. He is therefore a proper defendant for the Chambers' Section 7(B) claim. See Wagnon, 476 F.3d at 828.

We reach the opposite conclusion with regard to Section 7(C) because the Chambers do not cite to any Oklahoma law authorizing the Attorney General to enforce that provision. A violation of Section 7(C) constitutes a "discriminatory practice" under Oklahoma's Anti-Discrimination Act. Okla. Stat. tit. 25, § 1313(C)(1). But the sole provision of the Oklahoma Anti-Discrimination Act the Chambers cite requires only that the attorney general sue on behalf of a victim of discrimination in a housing context. § 1502.15(A); see also Collier v. Insignia Fin. Group, 981 P.2d 321, 325 (Okla. 1999). Because the Chambers have not shown us that the Attorney General has a particular duty to enforce Section 7(C), see Wagnon, 476 F.3d at 828, the Chambers' claim under that provision falls outside the scope of the Ex parte Young exception. The Attorney General is thus entitled to immunity as to that challenge. See Shell Oil Co. v. Noel, 608 F.2d 208, 211 (1st Cir. 1979) (merely because "an attorney general has a duty to prosecute all actions in which the state is interested [is not] enough to make him a proper defendant in every such action" (citation omitted)).

## IV

Oklahoma raises yet another jurisdictional challenge: It claims that the Tax Injunction Act (the "TIA"), 28 U.S.C. § 1341, deprived the district court of jurisdiction to enjoin Section 9. Because the TIA implicates the subject matter

jurisdiction of federal courts, we consider its applicability de novo. See Marcus

v. Kan. Dept. of Revenue, 170 F.3d 1305, 1308-09 (10th Cir. 1999). Oklahoma

argues that Section 9 imposes a revenue-producing tax, which federal courts are

without jurisdiction to enjoin. We conclude that Section 9 imposes a penalty, not

a tax, because its purpose is to regulate conduct rather than to raise revenue.

Accordingly, we reject Oklahoma's TIA contention.

**A**

In its entirety, the TIA provides: "The district courts shall not enjoin,

suspend or restrain the assessment, levy or collection of any tax under State law

where a plain, speedy and efficient remedy may be had in the courts of such

State." § 1341. There is no dispute that a sufficient remedy exists in Oklahoma

state court. Accordingly, we need only decide if the assessment imposed by

Section 9 is a tax within the meaning of § 1341. Marcus, 170 F.3d at 1312 n.4.

The answer to that question is a matter of federal law; whether the state labels the

assessment a tax is not dispositive. Id. at 1311.

The purpose of the TIA is straightforward: It serves to protect the "federal

balance" by permitting states to "define and elaborate their own laws through

their own courts and administrative processes . . . without undue interference

from the Federal Judiciary." Arkansas v. Farm Credit Servs. Of Cent. Ark., 520

U.S. 821, 826 (1997). To that end, the TIA erects a broad barrier to the

jurisdiction of federal courts. Id. at 825. "[C]ourts must guard against

-29-

interpretations of the Tax Injunction Act which might defeat its purpose and text."
Id. at 827. Nevertheless, the Supreme Court has recently cautioned that the TIA
is not a "sweeping congressional direction to prevent federal-court interference
with all aspects of state tax administration." Hibbs v. Winn, 542 U.S. 88, 105
(2004) (quotation omitted).

It can generally be said that an assessment is a tax when its purpose is to
raise revenue, "while levies assessed for regulatory or punitive purposes, even
though they may also raise revenues, are generally not 'taxes.'" Travelers Ins.
Co. v. Cuomo, 14 F.3d 708, 713 (2d Cir. 1994) (quotation omitted), rev'd on
other grounds, N.Y. State Conference of Blue Cross & Blue Shield Plans v.
Travelers Ins. Co., 514 U.S. 645 (1995). In deciding whether Section 9 imposes a
tax, the touchstone of our inquiry is the purpose of the assessment. See Hill v.
Kemp, 478 F.3d 1236, 1244-45 (10th Cir. 2007). In judging purpose, we
consider, among other things, the ultimate use of the funds. Id. at 1245; Marcus,
170 F.3d at 1311 (citing Collins Holding Corp. v. Jasper County, 123 F.3d 797,
800 (4th Cir. 1997); Hager v. City of W. Peoria, 84 F.3d 865, 870-71 (7th Cir.
1996); San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of P.R., 967 F.2d 683,
685 (1st Cir. 1992)). Yet, other evidence of purpose, such as the statute's avowed
purpose as stated in its text as well as the incentive structure created by a levy,
are also relevant. RTC Commercial Assets Trust 1995-NP3-1 v. Phoenix Bond &
Indem. Co., 169 F.3d 448, 457 (7th Cir. 1999); Hager, 84 F.3d at 870-71.

-30-

Two of our principal cases in this area have looked to the ultimate use of funds generated by a levy as evidence of its purpose. Hill, 478 F.3d at 1244-46; Marcus, 170 F.3d at 1311-12. In Marcus, Kansas charged drivers $5.25 to obtain a disabled parking placard. Id. at 1307. A portion of that fee was deposited in a dedicated fund to be used for the administration of the program at issue. Id. If that fund contained a positive balance at the end of the year, the balance would be transferred to the general fund. Id. Although it was unclear exactly how the other portion of the assessment was used, the statute mandated that the charge imposed for parking placards "shall not exceed the actual cost of issuance." Kan. Stat. Ann. § 8-1,125(c). Thus, the entire charge was "expressly linked to defraying administrative costs." Marcus, 170 F.3d at 1312. Because it was expressly tied to the administrative costs of a specific regulatory scheme, we determined that "the dominant purpose of these funds [was not] revenue raising." Id. Rather, the assessment's purpose was regulatory. Id. It therefore constituted a regulatory fee rather than a tax and fell outside the scope of the TIA. Id.

In Hill, we employed a similar analysis in reaching the opposite conclusion. 478 F.3d at 1244-46. At issue in that case were charges imposed by Oklahoma for specialty license plates bearing messages such as "Adoption Creates Families" and "Choose Life." Id. at 1239. We emphasized the ultimate use of the funds in determining that the "primary purpose of the special license plate scheme is revenue[-raising] rather than regulation and thus . . . it qualifies as a tax." Id. at

-31-

1244-45.  In particular, only $8.00 of a $35.00 charge was earmarked for administrative costs while the balance of the revenue was spread among a variety of programs, including those supporting the causes espoused by the license plates. Id. at 1245.  Because the entire public benefitted from the variety of state initiatives funded by the license plate scheme, we held that the assessments were taxes under the TIA.  Id.

But use is not always conclusive evidence of purpose.  Just as "[t]he label given by a state for an assessment or charge is not dispositive" of its character, Marcus, 170 F.3d at 1311, neither is the ultimate use of funds dispositive of an assessment's purpose, Hager, 84 F.3d at 870-71.  As our sibling circuit has explained, regardless of the ultimate use of funds, a non-tax assessment "may [also] serve regulatory purposes directly by . . . deliberately discouraging particular conduct by making it more expensive."  San Juan, 967 F.2d at 685 (citing South Carolina ex rel. Tindal v. Block, 717 F.2d 874, 887 (4th Cir. 1983)). Our decisions recognize as much.  The license plate charges at issue in Hill, for example, did not "purport to 'regulate' anyone by incentivizing or disincentivizing certain forms of conduct."  478 F.3d at 1246; see also Marcus, 170 F.3d at 1311 (citing Hager, 84 F.3d at 870-71).  Thus, "[r]ather than a question solely of where the money goes, the issue is why the money is taken." Hager, 84 F.3d at 870-71.  In Marcus and Hill, where the money went was strong evidence of why the money was taken.  Hill, 478 F.3d at 1244-46; Marcus, 170

F.3d at 1311-12. In other cases, however, a statute's incentive structure and avowed purpose more clearly elucidate its goal.

In RTC Commercial, for example, the court examined whether interest and penalties associated with nonpayment of taxes constituted taxes for purposes of the TIA. 169 F.3d at 457. Our sibling circuit concluded that the penalties were not taxes because they were assessed "so that delinquent tax debtors will be deterred the next time around from ignoring their legal obligations." Id. The incentive structure created by the penalties revealed their regulatory character: Penalties are designed to incentivize compliance with law, not to raise revenue. Id. Conversely, interest was logically a part of the tax itself because it was meant solely to account for the government's opportunity cost resulting from the delay in receiving the funds. Id.

Similarly, in Hager, the Seventh Circuit addressed an assessment that was earmarked for a general city fund, a fact superficially suggesting that the levy's ultimate purpose was to raise revenue. 84 F.3d at 870. But the court looked beyond the use of the funds, concluding instead that the fee was, as the ordinances at issue avowedly proclaimed, designed to regulate the weight of trucks using city streets. Id. at 871. The court's analysis turned on the stated purpose of the assessment as articulated in the text of the ordinance, admissions by the city's mayor about implementation, and the operation of the levy in the context of the state's motor vehicle laws. Id. Although the revenue raised ended

-33-

up in a general fund, the Seventh Circuit concluded that the assessment was a fee rather than a tax.  Id. at 870-72.  "That the ordinances generate a permit fee which goes to the general city fund is only incidental to its regulatory nature."  Id. at 871.

**B**

Applying these principles, we conclude that Section 9 of the Oklahoma Act constitutes a regulatory penalty, not a tax, because its purpose is to regulate behavior rather than to raise revenue.  See Hill, 478 F.3d at 1244-46; Marcus, 170 F.3d at 1311-12; RTC Commercial, 169 F.3d 457-58; Hager, 84 F.3d at 870-72; San Juan, 967 F.2d at 685-86.  By its plain terms, Section 9 was enacted "pursuant to the prohibition against the use of unauthorized alien labor."  Okla. Stat. tit. 68, § 2385.32(A).  Section 9 creates an incentive structure that, on pain of financial assessment, encourages employers to verify the employment authorization of their independent contractors.  It imposes a penalty on contracting entities that do not verify eligibility or withhold taxes from their independent contractors, § 2385.32(B), thereby "deliberately discouraging particular conduct by making it more expensive," San Juan, 967 F.2d at 685; see RTC Commercial, 169 F.3d at 457 ("States do not assess penalties for the purpose of raising revenue . . . .").  As in RTC Commercial, Oklahoma imposes a penalty "so that delinquent [contracting entities] will be deterred the next time around from ignoring their legal obligations."  169 F.3d at 457.

-34-

Moreover, the expressed primary goal of the Oklahoma Act is to regulate behavior.[21]  Oklahoma means to "discourage illegal immigration" through verification of work eligibility.  Oklahoma Taxpayer and Citizen Protection Act of 2002 § 2.  As the Oklahoma Attorney General acknowledged in its motion to dismiss below, the Act aims to "discourag[e] illegal aliens from seeking refuge in this state . . . [by] discouraging employers from hiring illegal aliens."  (Attorney General's Mot. to Dismiss 24).  As with the ordinances at issue in Hager, 84 F.3d at 871, the stated purpose of Section 9 is regulation, not revenue generation.  The mere fact that revenue received from a violation of Section 9 ends up in Oklahoma's general fund is of little significance when measured against the incentive structure created and the avowed statutory purpose.  See id. ("That the ordinances generate a permit fee which goes to the general city fund is only incidental to its regulatory nature.").

In response, the Attorney General retreats to the generalized assertion that "the statute's ultimate goal is to ensure that taxes are collected, not to regulate the employment of illegal aliens."  (Attorney General's Br. 23).  Notwithstanding that the Attorney General was of a different mind in the court below, (Attorney

---

[21] The partial dissent asserts that we "improperly focus[] on the motive for enactment of" Section 9 because "[t]he TIA is not concerned with why a state chooses to collect its taxes in a particular manner."  (Dissenting Op. 10.)  As discussed supra, however, the purpose of an assessment is key to our determination of whether it is a tax or a penalty.  See Hill, 478 F.3d at 1244-45.

General's Mot. to Dismiss 24), the primary purpose of Section 9 is <u>not</u> to ensure that taxes are collected.  To the contrary, if a contracting entity complies with Section 9 by verifying the employment authorization of its independent contractors, Oklahoma does not receive any revenue.  Okla. Stat. tit. 68, § 2385.32(A).[22]  Only if a contracting entity <u>violates</u> Section 9 does the state receive revenue.  It strains credulity to argue that the primary purpose of a law is to raise revenue when compliance with the law produces no revenue at all.  <u>See</u> <u>RTC Commercial</u>, 169 F.3d at 457 ("In a Utopian world where all citizens complied fully with their obligations, no penalties at all would be collected.").[23]  Accordingly, the TIA does not strip the district court of jurisdiction over the

---

[22] The partial dissent argues that Section 9 is "not some special assessment but income tax, pure and simple."  (Dissenting Op. 9-10.)  However, the fact that the amount of the penalty is set at the maximum assessable level of income tax and that Oklahoma uses the tax system to collect the revenue does not transform this penalty into a tax.  To decide that issue, we must inquire into the statute's purpose; here, that purpose is to ensure that employers verify the employment authorization status of their employees.

[23] Admittedly, a contracting entity may also comply with Section 9 by withholding an amount equal to "the top marginal income tax rate" allowed under Oklahoma law.  Okla. Stat. tit. 68, § 2385.32(A).  But Section 9 and the Oklahoma Act as a whole incentivize employment authorization verification above all else.  <u>See, e.g.</u>, Okla. Stat. tit. 25, § 1312(1)(a)-(d) (defining Status Verification System); § 1313(B)(2) (prohibiting businesses from contracting with public employers unless the business utilizes SVS); § 1313(C)(2) (providing a safe harbor from discriminatory practice liability for employers who utilize Basic Pilot); Oklahoma Taxpayer and Citizen Protection Act of 2002 § 2 (stating that the purpose of the Act is to "discourage illegal immigration" through verification of immigration status).  The <u>primary</u> purpose, therefore, is not to raise revenue because the preferred form of compliance does not generate revenue.

Section 9 challenge.[24]

## V

Satisfied of our jurisdiction, we turn at last to the main course. In order to obtain a preliminary injunction, the Chambers must show "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009) (quotation omitted). We review the district court's grant of a preliminary injunction for abuse of discretion. Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1230-31 (10th Cir. 2005). "A district court abuses its discretion when it commits an error of law or makes clearly erroneous factual findings." Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC, 562 F.3d 1067, 1070 (10th Cir. 2009).

## A

The Supremacy Clause provides that the laws of the United States "shall be the supreme Law of the Land[,] . . . any Thing in the Constitution or Laws of any

---

[24] The Tax Commission has a slightly different take than the Attorney General. The Commission contends that Section 9 creates a method of tax collection that may not be enjoined under the terms of the TIA. We need not address whether § 1341 deprives federal district courts of jurisdiction to enjoin the method a state chooses to collect a tax, however, because we disagree with the premise of the Commission's argument. Oklahoma is not collecting a "tax"; it is collecting a penalty designed to regulate conduct.

-37-

State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Pursuant to this provision, it has long been recognized that federal law preempts contrary state enactments. See M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 405-06 (1819). Preemption can be either express or implied. Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 713 (1985). State laws are expressly preempted when they fall within the scope of a federal provision explicitly precluding state action. See id. Alternatively, state laws may be impliedly preempted either as a result of conflict or field preemption. See id. We conclude that plaintiffs have demonstrated a strong likelihood that Section 7(C) is expressly preempted and that Section 9 is conflict preempted. Although my colleagues disagree, I would also hold that Section 7(B) is conflict preempted.

**1**

In considering express preemption, our inquiry is whether the state law at issue falls within the scope of a federal preemption provision. See Emerson v. Kan. City S. Ry. Co., 503 F.3d 1126, 1129 (10th Cir. 2007). We apply ordinary principles of statutory interpretation, looking initially to the plain language of the federal statute. Sprietsma v. Mercury Marine, 537 U.S. 51, 62-63 (2002).

IRCA preempts "any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit

or refer for a fee for employment, unauthorized aliens."[25]  8 U.S.C. § 1324a(h)(2) (emphasis added).  Oklahoma contends that Section 7(C) does not impose "sanctions" because it provides compensatory rather than solely punitive relief. We disagree.

IRCA does not define "sanction," but by its ordinary meaning, a sanction is "a restrictive measure used to punish a specific action or to prevent some future activity."  Webster's Third New Int'l Dictionary 2009 (1993).  Moreover, the statutory context does not evince an intent to narrowly define "sanction" as requiring a punitive component.  Title 8, Section 1324a(e)(4)(A) outlines a series of "penalties" for employers hiring unauthorized aliens, ranging from $250 to $10,000.  Penalties are ordinarily understood as serving punitive purposes.  Yet, in § 1324a(h)(2) Congress used the term "sanctions" rather than "penalty" as it did in § 1324a(e)(4)(A).  Had Congress intended to preempt only those state laws that are punitive, we would have expected it to use "penalties" in § 1324a(h)(2). Had it used "sanctions" in § 1324a(e)(4), we might reach a similar conclusion.  It did neither.

Section 7(C) subjects employers to cease and desist orders, reinstatement,

_____

[25] Until its reply brief, Oklahoma did not argue that the parenthetical savings clause in § 1324a(h)(2) spared the Oklahoma Act from express preemption.  Plaintiffs filed a motion to strike that portion of Oklahoma's reply brief which, for the first time, argues that the portions of the Act were akin to licensing laws.  Oklahoma has failed to preserve this argument, Bronson, 500 F.3d at 1104, and plaintiffs' motion to strike is thus granted.

back pay, costs, and attorneys' fees. Okla. Stat. tit. 25, § 1505(B), (C). Such impositions are "restrictive measures" that fall within the meaning of "sanctions" as used in § 1324a(h)(2). This conclusion is consistent with use of the term "sanction" in other provisions of federal law. An attorney, law firm, or party that violates Federal Rule of Civil Procedure 11(b), for example, is subject to "sanctions" including reasonable attorneys' fees and other expenses, Fed. R. Civ. P. 11(c)(4)—the very type of sanctions imposed by Section 7(C). Similarly, costs and attorneys' fees are mandatory sanctions for violations of Federal Rule of Civil Procedure 37(d). Fed. R. Civ. P. 37(d)(3).

Additionally, we conclude that Section 7(C) sanctions are imposed "upon those who employ . . . unauthorized aliens," 8 U.S.C. § 1324a(h)(2). An employer is subject to sanction under Section 7(C) if it terminates a legal worker while retaining a worker the employer knows, or should reasonably know, is an unauthorized alien. Okla. Stat. tit. 25, § 1313(C)(1). Sanctions are therefore contingent on the employment of an unauthorized alien. See id. We are not persuaded by Oklahoma's contention that Section 7(C) merely creates a cause of action for the termination of legal residents. While that is a necessary prerequisite, an employer is subject to sanction only if the employer retains an unauthorized alien. Id. The Chambers are thus likely to succeed on the merits of this portion of their express preemption claim.

-40-

**2**

In contrast, neither Section 7(B) nor Section 9 "impos[e] civil or criminal sanctions . . . <u>upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens</u>." <u>Id.</u> (emphasis added). Even assuming that Sections 7(B) and 9 impose "sanctions" as that term is used in § 1324a(h)(2), imposition of such sanctions is divorced from the employment of unauthorized aliens. Section 7(B) forces contractors to use Basic Pilot if they seek to contract with public employers. Okla. Stat. tit. 25, § 1313(B)(2). Thus Section 7(B) is violated not when an unauthorized alien is employed, but when an employer fails to utilize the Basic Pilot Program. <u>Id.</u>; § 1312(1)(a). The actual employment of an unauthorized alien is irrelevant in determining whether an employer has violated Section 7(B). § 1313(B)(2).

Similarly, Section 9 applies to contracting entities that do not verify the work authorization status of their individual independent contractors <u>and</u> that fail to withhold from the independent contractor an amount equal to "the top marginal income tax rate" allowed under Oklahoma law. Okla. Stat. tit. 68, § 2385.32(A). Whether an independent contractor is an unauthorized alien is of no significance under this regime. As with Section 7(B), a contracting entity can violate Section 9 even if its independent contractors are fully authorized to work in the United States. Accordingly, neither Section 7(B) nor Section 9 "impos[es] civil or criminal sanctions . . . upon those who employ, or recruit or refer for a fee for

employment, unauthorized aliens." 8 U.S.C. § 1324a(h)(2). The Chambers, therefore, are unlikely to succeed on the merits of their claims that Sections 7(B) and 9 are expressly preempted by IRCA.

**B**

In addition to express preemption, the Supremacy Clause prohibits states from enacting laws that make compliance with both federal and state law a physical impossibility or that "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[26] Fid. Fed. Sav. & Loan Ass'n v. De la Cuesta, 458 U.S. 141, 152-53 (1982) (quotation omitted). Even when federal and state statutes serve the same ultimate goal, "[t]he fact of a common end hardly neutralizes conflicting means." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 379 (2000); accord Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494 (1987). Although Section 9 does not render compliance with state and federal law a physical impossibility,[27] plaintiffs will likely succeed in their

---

[26] Neither the presence of an express preemption provision nor the presence of a savings clause by itself alters the operation of traditional implied preemption principles. Geier v. Am. Honda Motor Co., 529 U.S. 861, 869 (2000).

[27] Because federal law authorizes use of the Basic Pilot Program (albeit under certain constraints imposed by DHS), a business employing Basic Pilot under the terms of Section 7(B) would also be in compliance with federal law. Section 9 forces contracting entities to verify the work authorization of their independent contractors. This potentially exposes the business to liability for having engaged in an unfair immigration-related employment practice. See 8 U.S.C. § 1324b(a)(6). The federal prohibition, however, requires a specific intent to discriminate, id., which presumably would be lacking if the contracting entity

(continued...)

argument that the provision interferes with Congress' chosen methods and is thus conflict preempted.[28]  Although my colleagues disagree, I would hold that the plaintiffs have made a similar showing regarding Section 7(B).

**1**

Congress sought to balance a number of competing goals when it enacted IRCA—a balance it determined was best served by requiring employers to verify the work authorization status of their employees by using the I-9 system.  "IRCA is a carefully crafted political compromise which at every level balances specifically chosen measures discouraging illegal employment with measures to protect those who might be adversely affected."  Nat'l Ctr. For Immigrants' Rights, Inc. v. INS, 913 F.2d 1350, 1366 (9th Cir. 1990), rev'd on other grounds, 502 U.S. 183 (1991).

Among these goals were preventing the hiring of unauthorized aliens, lessening the disruption of American business, and minimizing the possibility of employment discrimination.  H.R. Rep. No. 99-682(I), at 56 (1986), as reprinted in 1986 U.S.C.C.A.N. 5649, 5660.  IRCA forbids the hiring of unauthorized aliens, but to lessen the burden on employers, it limits penalties to those who

---

[27](...continued)
verified with the sole purpose of complying with Section 9.

[28] Because we conclude that the Chambers are likely to succeed on the merits of their conflict preemption challenge to Section 9, we need not address whether Congress has occupied the field of work authorization verification.

"knowingly" violate the prohibition. 8 U.S.C. § 1324a(a)(1)(A). The federal statute provides a defense to employers who comply with the I-9 requirements in good faith. § 1324a(a)(3). Employers are not required to verify the work eligibility of independent contractors, which would increase the burdens on business and could lead to increased employment discrimination. 8 C.F.R. § 274a.1(f), (g); see also H.R. Rep. No. 99-682(I), at 57, 68. By making the I-9 system a uniform national requirement, Congress limited the compliance burden on interstate corporations while facilitating uniform enforcement. Finally, by forbidding employers from requesting "more or different documents" than § 1324a requires or "refusing to honor documents tendered that on their face reasonably appear to be genuine," § 1324b(a)(6), Congress sought to limit employment discrimination, a goal which is also served by a uniform system of employment authorization verification, H.R. Rep. No. 99-682(I), at 68. IRCA thus embodies a carefully considered balance of various competing objectives.

Against this backdrop, Congress enacted IIRIRA, directing the Attorney General (later the Secretary of Homeland Security) to establish the Basic Pilot Program as a voluntary supplement to, not a replacement for, the I-9 system. Basic Pilot Program Extension and Expansion Act of 2003 §§ 3-4; IIRIRA § 401(a). Section 402 of IIRIRA stresses the voluntary nature of the program. See IIRIRA § 402(a) ("Voluntary Election."); id. ("[A]ny person . . . that conducts any hiring . . . in a State in which a pilot program is operating may elect

-44-

to participate . . . ." (emphasis added)); § 402(d)(2) ("The [Secretary of Homeland Security] shall widely publicize the election process and pilot programs, including the <u>voluntary nature</u> of pilot programs . . . ." (emphasis added)); § 402(d)(3), (3)(A) ("The [Secretary of Homeland Security] shall designate one or more individuals . . . to inform persons and other entities that seek information about pilot programs of the <u>voluntary nature</u> of such programs . . . ." (emphasis added)). Further, Congress withheld from the Secretary of Homeland Security authority to require private employers to utilize Basic Pilot. § 402(a) ("Except as specifically provided in subsection (e), the [Secretary of Homeland Security] may not require any person or other entity to participate in a pilot program."); § 402(e) (listing particular federal government entities required to utilize Basic Pilot and authorizing the Secretary of Homeland Security to order certain violators of the Immigration and Nationality Act to use the program). Although Basic Pilot is now available in all fifty states, Congress continues to decline to make it mandatory. <u>E.g.</u>, Omnibus Appropriations Act of 2009 div. J, § 101; Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009 § 143; Basic Pilot Extension Act of 2001 § 2.

**2**

I would hold that Section 7(B) disturbs the balance between these

conflicting goals deliberately crafted by Congress.[29]  In enacting IRCA, IIRIRA, and other immigration reforms along the way, Congress has made calibrated judgments regarding several competing considerations.  Congress has continually concluded that employment verification should be required, but that the I-9 system strikes the best balance between preventing employment of unauthorized workers, easing burdens on employers, and preventing employment discrimination.

Yet, Section 7(B) would make Basic Pilot effectively mandatory for many employers, on pain of debarment from public contracts.  Because Oklahoma has mandated Basic Pilot despite Congress' determination that employer participation should be voluntary, the Chambers can likely succeed in showing that Oklahoma has undermined Congress' judgment that voluntary participation best serves the relevant competing considerations.[30]  Such interference with Congress' selected

---

[29] I reject Oklahoma's request that we apply a presumption against preemption.  As the Supreme Court has made clear, "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." United States v. Locke, 529 U.S. 89, 108 (2000) (citing Rice v. Santa Fe Elevator Corp., 331 U.S. 218 (1947)).  Federal regulation of immigration is longstanding, as is its regulation of work authorization verification.

[30] As of September 8, 2009, Executive Order 12,989 requires federal government contractors to use Basic Pilot to confirm the immigration status of all employees working directly on federal government contracts and all employees hired during the contract terms regardless of whether or not they work on the contracts.  The power of the President to mandate the use of Basic Pilot in the face of the congressional directive to the Attorney General preventing him from

(continued...)

-46-

means would violate the Supremacy Clause.  <u>Crosby</u>, 530 U.S. at 379.

**3**

We conclude that Section 9 similarly upsets Congress' carefully constructed balance by interfering with its chosen methods.  That provision would require contracting entities, on pain of burdensome withholding requirements or penalties, to verify the work authorization status of independent contractors. Congress, by contrast, intentionally excluded independent contractors from verification obligations.  <u>See</u> 8 U.S.C. § 1324a(a)(1)(A); 8 C.F.R. § 274a.1(f), (g); H.R. Rep. No. 99-682(I), at 57.  By requiring verification of independent contractors, Oklahoma risks exposing contracting entities to liability under federal law.  <u>See</u> 8 U.S.C. § 1324b(a)(6), (b).  Although a business must act with the specific intent to discriminate to be liable under federal law, § 1324b(a)(6), it is likely that a contracting entity will face increased claims of unfair employment practices as a result of the enhanced obligations Section 9 would impose.

---

[30](...continued)
doing so is not at issue before us.  Regardless, nothing in this executive action allows the judicial branch to ignore congressional language that indicates the program should not be mandatory.  It is particularly inappropriate to give determinative weight to this executive action given the statistical disparities in tentative non-confirmation rates between work-eligible foreign-born employees and U.S.-born employees discussed <u>supra</u>.

**4**

Oklahoma's principal argument in opposition to our conflict preemption holding is its assertion that "Oklahoma's goals in implementing these statutes are consistent with federal goals in reducing illegal immigration." (Attorney General's Br. 50). But "[i]n determining whether [state] law 'stands as an obstacle' to the full implementation of [federal law], it is not enough to say that the ultimate goal of both federal and state law is [the same]." Int'l Paper Co., 479 U.S. at 494. "A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal." Id.

The Supreme Court's decision in Geier v. American Honda Motor Co., 529 U.S. 861 (2000), is particularly instructive. In that case, plaintiffs sued Honda after Alexis Geier was seriously injured in a car crash. Id. at 865. They claimed that the car Alexis was driving was negligently and defectively designed because it lacked a driver's side airbag. Id. At the time of the accident, federal safety standards provided car manufacturers with a range of options for passive restraint devices. Id. at 874-75. Geier's lawsuit, by contrast, would have required auto manufacturers to install an airbag. Id. at 881. Because that outcome would undermine Congress' decision to permit a variety of devices, the state tort suit was impliedly preempted; it "would have stood as an obstacle to the accomplishment and execution of the important means-related federal objectives." Id. (quotation omitted); see also De la Cuesta, 458 U.S. at 156 (state law that

-48-

limited the availability of an option considered essential to a federal scheme was conflict preempted).

The situation in Geier strongly parallels the interaction between Section 7(B) and IRCA. Federal law provides employers with a carefully calibrated set of alternatives for verification of work authorization status. Whether to utilize the I-9 system or the Basic Pilot Program is a choice that Congress has to date, in its considered judgment, given to employers. State tort law could not require automobile manufacturers to install particular safety precautions when Congress and the relevant federal agency expressly provided manufacturers with choices. Geier, 529 U.S. at 878, 881. Similarly, state legislation may not mandate a particular verification method that Congress has expressly left voluntary. Section 7(B) effectively does just that, requiring employers to utilize Basic Pilot.

Geier's reasoning implicates Section 9 as well. Whereas Section 7(B) would restrict the range of choices Congress offered employers, Section 9 would create obligations on contracting entities that Congress expressly chose not to impose. See 8 U.S.C. § 1324a(a)(1)(A); 8 C.F.R. § 274a.1(f), (g); H.R. Rep. No. 99-682(I), at 57; cf. Geier, 529 U.S. at 881. Just as state tort law could not require airbag installation when the federal government had balanced competing interests and decided against such a requirement, Geier, 529 U.S. at 877-78, neither can Oklahoma's statutory law require verification of independent contractors when Congress plainly chose not to do so.

**5**

Finally, Oklahoma's reliance on <u>Chicanos Por La Causa</u> is misplaced. In that case, the Ninth Circuit concluded that an Arizona law requiring employers to use Basic Pilot was not expressly preempted because it fell within 8 U.S.C. § 1324a(h)(2)'s savings clause, 558 F.3d at 866, and that the state law was not impliedly preempted, <u>id.</u> at 866-67. Its implied preemption holding was based in large part on the initial conclusion that the Arizona law fell within the savings clause. <u>Id.</u> at 867. The court stated:

> Congress could have, but did not, expressly forbid state laws from requiring [Basic Pilot Program] participation. It certainly knew how to do so because, at the same time, it did expressly forbid any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.

<u>Id.</u> (quotation omitted). This is problematic because it implies that the presence of an express preemption provision precludes the possibility of implied preemption. But that is emphatically not the case. <u>Geier</u>, 529 U.S. at 869 ("We now conclude that the saving clause (like the express pre-emption provision) does <u>not</u> bar the ordinary working of conflict pre-emption principles."). On the one hand, because Oklahoma has waived any argument that its Act is a licensing or other similar law, 8 U.S.C. § 1324a(h)(1); <u>supra</u> note 23, the Ninth Circuit's opinion is distinguishable. On the other, we are unpersuaded by its reasoning.

## C

Having concluded that the Chambers have shown a strong likelihood of succeeding on the merits of their preemption challenges to Sections 7(C) and 9, we turn to the remaining preliminary injunction factors. To obtain a preliminary injunction, the Chambers must also demonstrate a likelihood that they will suffer irreparable harm absent preliminary relief, that the balance of equities tips in their favor, and that the injunction is in the public interest. Tyson Foods, Inc., 565 F.3d at 776.

We conclude that the Chambers will likely suffer irreparable harm absent a preliminary injunction. Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury. Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs., 31 F.3d 1536, 1543 (10th Cir. 1994); see also Ohio Oil Co. v. Conway, 279 U.S. 813, 814 (1929) (holding that paying an allegedly unconstitutional tax when state law did not provide a remedy for its return constituted irreparable injury in the event that the statute were ultimately adjudged invalid); Greater Yellowstone Coal. v. Flowers, 321 F.3d 1250, 1258 (10th Cir. 2003) ("An irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." (quotation and emphasis omitted)). If forced to comply with the Oklahoma Act, the Chambers' members will face a significant risk of suffering financial harm as

described in Part II.  Yet, because Oklahoma and its officers are immune from suit for retrospective relief, Edelman, 415 U.S. at 667-68, these financial injuries cannot be remedied.  Should the Chambers' members decline to comply with the Act, they face investigation and other consequences for having engaged in a discriminatory practice under Section 7(C) and liability under Section 9 for having failed to verify the work authorization of independent contractors.  I would further note that they face debarment from public contracts under Section 7(B).  These consequences, in and of themselves, demonstrate a likelihood of irreparable harm.

Moreover, the balance of equities tips in the Chambers' favor, and the public interest is served by an injunction.  Oklahoma does not have an interest in enforcing a law that is likely constitutionally infirm.  Moreover, "the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law."  Bank One v. Guttau, 190 F.3d 844, 848 (8th Cir. 1999); see also Utah Licensed Beverage Ass'n v. Leavitt, 256 F.3d 1061, 1076 (10th Cir. 2001) (public interest favors preliminarily enjoining state statutes likely to be held unconstitutional).  We are unpersuaded by the argument that the Oklahoma Act vindicates the public interest because it serves a purpose consistent with federal law:  deterrence of illegal immigration and the hiring of unauthorized workers.  Even assuming federal law singlemindedly pursues this goal, it does not follow that simply because the two serve the same goal, enforcing the state law is

in the public interest. "The fact of a common end hardly neutralizes conflicting means." Crosby, 530 U.S. at 379. Ultimately, we conclude that the district court did not abuse its discretion in granting a preliminary injunction.

## VI

For the reasons stated, we **DISMISS** the Attorney General from the case insofar as he is named as a defendant in the challenges to Sections 7(C) and 9. The district court's grant of summary judgment against the enforcement of Section 7(B) is **REVERSED**. In all other respects, the judgment of the district court is **AFFIRMED**. Plaintiffs' motion to strike is **GRANTED**.

08-6127 & 08-6128, <u>Chamber of Commerce of the United States of America v.</u>
<u>W.A. Drew Edmondson.</u>

**KELLY**, Circuit Judge, concurring in part.


I concur in Judge Lucero's opinion with the exception of parts V(B)(2) and (4) concluding that Section 7(B) is conflict preempted. As noted by Judge Lucero, the panel majority, albeit for different reasons, reverses the district court's grant of a preliminary injunction against the enforcement of Section 7(B). My reasoning is as follows. Even accepting that federal regulation of immigration and work-authorization verification is now the norm, the federal government's encouragement of a web-based system to reduce the employment of unauthorized aliens cannot be overlooked—including requiring the system for federal contractors. <u>See</u> 73 Fed. Reg. 67,704 (2008). Though E-verify is voluntary (as of yet) at the national level, it is not reasonable to assume that a mandatory program choice for state public contractors conflicts with Congressional purpose. In my view, Congress obviously foresaw the potential for increased use of technology. <u>See</u> <u>Chicanos Por La Causa, Inc. v. Napolitano</u>, 558 F.3d 856, 866-67 (9th Cir. 2009). To hold that the State is preempted from requiring such use in these circumstances reads too much into the federal government's provision of choice. After all, choice is not an end in itself and no evidence suggests that federal standards concerning immigration and employment-verification will be compromised by E-Verify.

08-6127, 08-6128 - *Chamber of Commerce of the United States of America v. W.A. Drew Edmondson*

**HARTZ**, Circuit Judge, concurring and dissenting:

My views with respect to Plaintiffs' challenges to Sections 7(B), 7(C), and 9 of H. B.1804 are somewhat different from those of the others on this panel. In my view, Plaintiffs lack standing to seek an injunction against the Attorney General with respect to Section 7(B), and their claim with respect to Section 9 is barred by the Tax Injunction Act. I concur with the other members of the panel in affirming the injunction against enforcement of Section 7(C), but my grounds are narrower than theirs.

## I.     SECTION 7 (B)

I respectfully dissent from the majority opinion's holding that the district court had jurisdiction to enjoin the Attorney General from enforcing Okla. Stat. tit. 25, § 1313(B) (Section 7(B) of H.B. 1804). In my view, the Plaintiffs did not have standing to bring their claim against the Attorney General.

As recently stated by the Supreme Court,

> To seek injunctive relief, a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; this threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009). What is missing in this case is that the Plaintiffs have not shown that they face an actual and

imminent threat of injury traceable to actions of the Attorney General with regard to § 1313(B).

Section 1313(B) states as follows:

1. After July 1, 2008, no public employer shall enter into a contract for the physical performance of services within this state unless the contractor registers and participates in the Status Verification System to verify the work eligibility status of all new employees.

2. After July 1, 2008, no contractor or subcontractor who enters into a contract with a public employer shall enter into such a contract or subcontract in connection with the physical performance of services within this state unless the contractor or subcontractor registers and participates in the Status Verification System to verify information of all new employees.

3. The provisions of this subsection shall not apply to any contracts entered into prior to the effective date of this section even though such contracts may involve the physical performance of services within this state after July 1, 2008.

This statute does not require or provide for any enforcement by the Attorney General. (The Attorney General may have duties as a "public employer," but the Plaintiffs are not seeking relief from him in that role.) The Plaintiffs' sole claim is that the Attorney General may have a role under § 1313(B) because of his duties in reviewing and approving state contracts and his duty to enforce state law (presumably by bringing suit to make sure that public employers comply with the statute). As for the alleged duty to review and approve state contracts, the Plaintiffs have presented no evidence that such review and approval is part of the work of the Attorney General. The statutes cited by

the Plaintiffs do no more than authorize state agencies to request assistance from the Attorney General in preparing contracts, *see* 74 Okla. Stat. tit. 74, § 18b(A)(7) (2001), and authorize the Attorney General to enforce state law, *see id.* §§ 18b(A)(3), (9), (10), (16). And the Attorney General represents to this court that review of state-agency contracts by the Attorney General does not "occur as a matter of practice in Oklahoma." Att'y Gen. Suppl. Br. at 3 (May 22, 2009). Consequently, the substance of an injunction against the Attorney General would be solely to enjoin him from bringing suit to require other public officials to comply with § 1313(B).

The Plaintiffs' standing thus depends on their showing an actual and imminent threat that the Attorney General will bring or threaten suit to require public employers to comply with § 1313(B). I am aware of no such showing. Even if one could assume that the Attorney General has a particular interest in that statute and would be willing if not eager to take action against public employers who fail to comply with it, there is nothing in the record to suggest that any public employer is recalcitrant. It is pure speculation to believe that action by the Attorney General with respect to § 1313(B) is imminent, or that any imminent injury to be suffered by the Plaintiffs' members from enforcement of § 1313(B) is fairly traceable to the Attorney General.

This is not a case in which the Attorney General is sued to make sure that all the bases are covered. For example, someone fearful of being improperly

prosecuted under a criminal statute may sue the Attorney General as well as the district attorney, because the Attorney General may step in if the district attorney is precluded from doing so. In the circumstances before us in this case, however, if a public employer were enjoined from enforcing § 1313(B) because it is invalid, I would not expect the Attorney General to bring suit against the public employer to enforce that section.

We have previously held that a plaintiff lacked standing to bring a claim because the wrong defendant was selected. In *Nova Health Systems v. Gandy*, 416 F.3d. 1149, 1154 (10th Cir. 2005), the plaintiffs challenged an Oklahoma statute providing that "[a]ny person who performs an abortion on a minor without parental consent or knowledge shall be liable for the cost of any subsequent medical treatment such minor might require because of the abortion." Okla. Stat. tit. 63, § 1-740. Under that law, suit to recoup such medical costs could be brought by minors or by "medical facilities that incur certain treatment costs that their patients fail to reimburse." *Nova Health*, 416 F.3d at 1156. The plaintiff was an abortion provider, and the defendants were officials of state-run medical institutions who, in theory, could bring suit under the law to recoup treatment costs. The plaintiff, we said, had shown an injury in fact because the law created potential liability that discouraged the plaintiff from performing abortions absent parental consent, and there was evidence that a parental-consent policy would result in the loss of "some business." *Id.* at 1155. We concluded, however, that

-4-

the plaintiff could not fairly trace this injury to the named defendants. *See id.* at 1156–58. Although the defendant medical institutions could bring suit under the law, they could do so only if "they happen to (1) incur medical costs (2) not reimbursed by the patient (3) that were required because of an abortion (4) performed by [plaintiff] (5) on a minor (6) without parental consent or knowledge." *Id.* at 1157. This speculative prospect was insufficient to support standing. *See id.* at 1157–58.

A decision by the Third Circuit is also instructive. *1st Westco Corporation v. School District of Philadelphia*, 6 F.3d 108 (3d Cir. 1993), concerned a Pennsylvania statute "mandat[ing] that only Pennsylvania residents may work on public school construction projects." *Id.* at 111. An individual school district could "refuse payment of [a] contract price to [a] contractor'" who employed out-of-state labor. *Id.* at 113 (internal quotation marks omitted). A Pennsylvania school district invoked the law against Westco, a construction company that had employed New Jersey workers to renovate three of the district's buildings. *See id.* at 111–12. Westco challenged the constitutionality of the residency requirement in federal court and obtained a favorable judgment against the school district, the Secretary of Education, and the Attorney General. *See id.* On appeal the Third Circuit ruled that there was "no case or controversy" between the Attorney General and Westco. *Id.* at 116. The court reasoned that the residency law charged the Pennsylvania school districts, not the Attorney General, with

enforcing it. *See id.* at 113. The court acknowledged that the Attorney General had a "general duty to enforce the laws of the Commonwealth of Pennsylvania," and that it was "theoretically possible" that he could "initiate[] suit against Westco's interests." *Id.* at 114. But because the record did not establish a "realistic likelihood" of such action, *id.*, the court concluded that Westco lacked standing to sue the Attorney General, *see id.* at 114–16.

Following this authority, I would hold that the Plaintiffs lacked standing to bring their claim against the Attorney General. The record fails to show that the prospect of the Attorney General taking action to enforce Section 1313(B) is more than speculative. Because the district court lacked jurisdiction over that claim, we should reverse and remand for dismissal. I therefore concur in the reversal of the district court's preliminary injunction against the enforcement of Section 1313(B).

## II.    SECTION 9

I respectfully dissent from the majority opinion's holding that the district court had jurisdiction to enjoin the enforcement of Okla. Stat. tit. 25, § 2385.32 (§ 9 of H.B. 1804). In my view, such injunctive relief is barred by the Tax Injunction Act (the "TIA"), 28 U.S.C. §1341. Federal law is clear that the TIA forbids injunctions against tax-withholding statutes. And § 2385.32 is such a

statute; it requires withholding of income taxes from payments made to certain

independent contractors and provides for enforcement of the requirement.

Okla. Stat. tit. 25, § 2385.32(A) states:

If an individual independent contractor, contracting for the physical performance of services in this state, fails to provide to the contracting entity documentation to verify the independent contractor's employment authorization, pursuant to the prohibition against the use of unauthorized alien labor through contract set forth in 8 U.S.C. Section 1324a(a)(4), the contracting entity shall be required to withhold state income tax at the top marginal income tax rate as provided in Section 2355 of Title 68 of the Oklahoma Statutes as applied to compensation paid to such individual for the performance of such services within this state which exceeds the minimum amount of compensation the contracting entity is required to report as income on United States Internal Revenue Service Form 1099.

In other words, if one who hires an independent contractor cannot obtain

verification of the contractor's authorization to work in this country, the hirer

must withhold income taxes from its payments to the contractor.

Section 2385.32(B) makes the hirer liable for taxes that should have been

withheld.

Although it may be rare for a government to require tax withholding from

payments to independent contractors, it is not uncommon to require that taxes be

withheld from payments other than wages to employees. For example, Oklahoma

requires income-tax withholding from royalty payments to nonresidents. *See*

Okla. Stat. tit. 25, § 2385.26. Royalty withholding serves the purpose of ensuring

that nonresidents pay required Oklahoma income taxes. If Oklahoma is

concerned that independent contractors, or certain subsets of independent contractors, are likely to evade payment of required state income tax, it can similarly require withholding of payments to those independent contractors to ensure that their income-tax obligations will be satisfied.

The TIA forbids injunctions against such withholding statutes. The TIA states:

> The district courts shall not enjoin, suspend or restrain the assessment, levy or *collection* of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1341 (emphasis added). Withholding is a method for collection of taxes, and it cannot be enjoined even if the tax might be collected by other means. In *United States vs. American Friends Service Committee* (AFSC), 419 U.S. 7 (1974) (per curiam), a district court had enjoined the government from enforcing the statute requiring the withholding of income taxes from the salaries of AFSC's employees. (The employees wished to express their opposition to war by refusing to pay taxes.) The Supreme Court held that the district court's injunction was barred by the Anti-Injunction Act, 26 U.S.C. § 7421(a). The Anti-Injunction Act is the equivalent of the TIA for federal taxes. It states:

> Except as provided in sections 6015(e), 6212(a) and (c), 6213(a), 6225(b), 6246(b), 6330(e)(1), 6331(i), 6672(c), 6694(c), 7426(a) and (b)(1), 7429(b), and 7436, no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.

26 U.S.C. § 7421(a).  The Supreme Court explained:

> [The employees] contend . . . that since the District Court enjoined only one method of collection, and the Government is still free to assess and levy their taxes when due, the Act does not apply.  But this contention ignores the plain wording of the Act which proscribes any "suit for the purpose of restraining the assessment or collection of any tax."  The District Court's injunction against the collection of the tax by withholding enjoins the collection of the tax, and is therefore contrary to the express language of the Anti-Injunction Act.

*Am. Friends*, 419 U.S. at 10.

The two published circuit-court opinions that have addressed state withholding statutes have held that the TIA likewise forbids injunctions against such statutes.  *See Int'l Lotto Fund v. Virginia State Lottery Dep't*, 20 F.3d 589, 591 (4th Cir. 1994); *Sipe v. Amerada Hess Corp.*, 689 F.2d 396, 402-03 (3d Cir. 1982) (unemployment and disability withholding).  I would follow the above authority and hold that the district court was deprived by the TIA of jurisdiction to enjoin the enforcement of Okla. Stat. tit. 25, § 2385.32.  This is not to say that the statute can escape judicial scrutiny.  The TIA does not bar a federal court from granting relief to one who has already paid a challenged state tax; and, as far as the TIA is concerned, a state court could enjoin enforcement of a state-court statute.  The point is only that the district court lacked jurisdiction to consider the relief sought at this time.

The majority opinion makes what I believe to be two errors in its analysis.  First, it ignores that what is collected under § 2385.32 is not some special

assessment but income tax, pure and simple.  Thus, if the withheld amount is greater than what the independent contractor actually owes in income taxes, the independent contractor can file an Oklahoma tax return and obtain a refund of the excess payment.

Second, the majority opinion improperly focuses on the motive for enactment of § 2385.32.  The TIA is not concerned with why a state chooses to collect its taxes in a particular manner.  After all, even if the tax itself is unconstitutional (because, say, of an improper purpose), the TIA forbids federal courts from enjoining collection of the tax. In any event, I question the majority opinion's analysis of that motive.  The opinion quotes selectively from § 2 of H.B. 104, which is in essence the preamble to the statute.  Section 2 states in full:

> [1] The State of Oklahoma finds that illegal immigration is causing economic hardship and lawlessness in this state and that illegal immigration is encouraged when public agencies within this state provide public benefits without verifying immigration status. [2] The State of Oklahoma further finds that when illegal immigrants have been harbored and sheltered in this state and encouraged to reside in this state through the issuance of identification cards that are issued without verifying immigration status, these practices impede and obstruct the enforcement of federal immigration law, undermine the security of our borders, and impermissibly restrict the privileges and immunities of the citizens of Oklahoma.  [3] *Therefore, the people of the State of Oklahoma declare this it is a compelling public interest of this state to discourage illegal immigration by requiring all agencies within this state to fully cooperate with federal immigration authorities in the enforcement of federal immigration laws.*  [4] *The State of Oklahoma also finds that other measures are necessary to ensure the integrity of various governmental programs and services.*

(emphases added).  As I read this section, the general comments regarding illegal immigration expressed in the first two sentences are to support the proposition in the third sentence that state agencies should cooperate with federal authorities to enforce federal immigration law.  The sentence relevant to the withholding statute, however, is the final sentence, which states that "other measures are necessary to ensure the integrity of various governmental programs and services." It is therefore quite reasonable to infer that the purpose of the withholding statute is to protect the integrity of Oklahoma's income-tax system by ensuring that unlawful immigrants acting as independent contractors pay Oklahoma income taxes, much as withholding on royalty payments to nonresidents ensures payment of taxes by nonresidents.

## III.   SECTION 7(C)

I agree with the majority opinion in affirming the injunction against the Human Rights Commission with respect to enforcement of §7(C).  The Plaintiffs have standing to seek the injunction; and §7(C) is preempted by the IRCA because it provides for the imposition of civil sanctions for employing unauthorized aliens.  I would not go as far as the majority opinion, however, in saying that reinstatement, back pay, costs, and attorney fees are *civil sanctions* within the meaning of that term in the IRCA .  I would be inclined to agree with the Second Circuit opinion in *Madeira v. Affordable Housing Foundation, Inc.*, 469 F.3d 219, 239–40 (2d Cir. 2006), which held that compensatory relief does

not come within the IRCA's meaning of *civil sanctions*. Nevertheless, among the types of relief provided by Oklahoma for discriminatory practices (which include violations of §7(C)) are civil penalties of up to $50,000 for a first violation and $100,000 for a second. *See* Okla. Stat. tit. 25, §1506.6(B)(3). Perhaps some of §7(C) could be saved by excluding those civil-penalty provisions from its reach; but the Defendants have not argued for such a result.